JAMES WASHINGTON,

        *Petitioner*,                                     MEMORANDUM
                                                                    AND ORDER
                                                                    09-CV-544 (JG)

       -against-

WILLIAM BROWN, Superintendent,
Eastern New York Correctional Facility,

        *Respondent*.
-----------------------------------------------------------x
A P P E A R A N C E S :

       JAMES WASHINGTON
            04-A-3581
            Eastern New York Correctional
            Facility
            P.O. Box 338
            Napanoch, NY 12458
            Petitioner, *Pro Se*

       RICHARD A. BROWN
            Queens County District Attorney
            125-01 Queens Boulevard
            Kew Gardens, NY 11415
       By:    John M. Castellano
                  Nicoletta J. Caferri
                  Laura T. Ross
            *Attorneys for Respondent*

JOHN GLEESON, United States District Judge:

       James Washington, currently incarcerated in the Eastern New York Correctional Facility, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking relief from his conviction in New York State Supreme Court of first-degree manslaughter and third-degree criminal possession of a weapon. Washington alleges that the trial judge erred in refusing to admit evidence of the victim's prior criminal record and that he was denied effective assistance

of counsel at various stages in the proceedings against him. For the reasons stated below, Washington's petition is denied.

BACKGROUND

A.  *Washington's Trial and Sentencing*

The parties agreed to a bench trial of the charges against Washington. The government's evidence at trial established that on the evening of November 2, 2001, Washington struck Darryl Pelle in the head with a baseball bat. Pelle died from injuries inflicted by Washington several days later.

Monique Jessie testified for the prosecution. She stated that on November 2, 2001, after speaking briefly with Pelle on the street, she turned to walk into a store and heard a loud thump. Turning around, she saw Washington hit Pelle three or four times with a bat while saying "Next time you know to keep your hands off of females." Tr. at 250-55.

John Pelle, an uncle of Darryl Pelle, testified that he heard there was a fight and walked toward the crowd forming at the scene. He saw his nephew on the ground and saw Washington walking away holding a bat. He then drove his nephew to the emergency room. On his way home, he saw Washington and asked him, "Why did you do that," to which Washington responded, "Well, he disrespected my daughter, and that's how I'm going out." Tr. at 173. Darryl Pelle was pronounced dead on November 8, 2001.

Wahington testified that he was in the neighborhood to visit his mother, and he passed a group of men on the sidewalk. A man that Washington had never seen before approached him and swung the bat at him, but Washington blocked the swing and wrested the bat away. Washington then turned and saw Darryl Pelle reaching for a gun in his waistband. He

then hit Pelle with the bat twice, once on the left arm and once on the right side of his head. Washington also stated that at the time of the altercation, he had no knowledge of "whether [Pelle] had been involved in an incident with [Washington's] daughter Tiffany on a previous occasion." Tr. at 366.

On May 27, 2004, the judge found Washington guilty of first-degree manslaughter and third-degree criminal possession of a weapon. The judge sentenced Washington to 23 years' imprisonment on the manslaughter count and seven years on the possession count, with the sentences to run concurrently.

B.  *Appeal and Collateral Proceedings*

On appeal, Washington filed a counseled brief arguing that the trial judge improperly refused to provide Washington access to Pelle's criminal record and erred in refusing to admit evidence concerning Pelle's record to prove that Washington knew of Pelle's prior violent acts and that Pelle was the initial aggressor in their encounter. He also filed a *pro se* brief arguing that the trial judge failed to inquire into an alleged conflict of interest between Washington and Frank Hancock, the attorney who represented Washington in his initial suppression hearing.

While his appeal was pending, Washington filed a motion under New York Crim. Proc. L. §440.10 to vacate his judgment of conviction. He contended that Hancock was ineffective because he labored under a conflict of interest and because he failed to seek a *Payton* hearing. Washington also alleged that Scott Brettschneider, who represented him at trial, had a conflict of interest because he had represented a relative of Darryl Pelle in an unrelated matter at the time of Washington's trial and was ineffective because he failed to object to an alleged *Brady*

3

violation and to improper arguments made by the prosecutor in summation. On January 24, 2007, Justice Stephen A. Knopf denied Washington's motion. He held that Washington's claim regarding Hancock's conflict of interest was pending before the Appellate Division and thus not properly before him, that his claims regarding Hancock's and Brettschneider's ineffectiveness were procedurally barred because Washington failed to raise them on direct appeal, and that his claim regarding Brettchneider's alleged conflict of interest was meritless. The Appellate Division denied leave to appeal Judge Knopf's decision on August 20, 2007.

On October 23, 2007, the Appellate Division affirmed Washington's conviction. *People v. Washington*, 843 N.Y.S.2d 686 (2d Dep't 2007). It held that the trial court had not abused its discretion in excluding evidence, that any evidence excluded would have been cumulative, and that Washington's remaining contentions were meritless. The Court of Appeals denied leave to appeal on January 10, 2008. *People v. Washington*, 9 N.Y.3d 1040 (2008).

Washington then petitioned the Appellate Division for a writ of error *coram nobis*. In this petition, he alleged that his appellate counsel was ineffective for failing to raise the ineffective assistance claims discussed above. The Appellate Division denied Washington's petition on September 16, 2008. *People v. Washington*, 54 A.D.3d 886 (2d Dep't 2008). The Court of Appeals denied leave to appeal on January 23, 2009. *People v. Washington*, 11 N.Y.3d 931 (2009).

DISCUSSION

A.  *Review of State Court Adjudications under AEDPA*

A federal habeas court may overturn a state court's ruling on the merits of a claim only if the state decision was "contrary to, or an unreasonable application of, clearly established

4

Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A decision is "an unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413. An unreasonable application is more incorrect than a merely erroneous one, *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (citing *Williams*, 529 U.S. at 411), but while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence," *Gilchrist*, 260 F.3d at 93 (internal quotation marks omitted).

AEDPA's limited scope of review applies whenever a state court disposes of a state prisoner's federal claim on the merits and reduces its disposition to judgment, regardless of whether it explicitly refers to federal law in its decision. *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001). If a state court's summary disposition of a petition does not expressly indicate that a claim was denied as procedurally barred, a federal court must presume that the state court denied that claim on the merits. *Jimenez v. Walker*, 458 F.3d 130, 146 (2d Cir. 2006).

B.      *Exhaustion of State Court Remedies*

5

Generally, a state prisoner seeking federal habeas review must first exhaust available state court remedies. 28 U.S.C. § 2254(b)(1). This exhaustion requirement is not satisfied unless the federal claim has been "fairly presented" to the state courts. *Daye v. Att'y Gen.*, 696 F.2d 186, 191 (2d Cir. 1982) (internal citation omitted). The district court has discretion to deny a petition that contains both exhausted and unexhausted claims on the merits. 28 U.S.C. § 2254(b)(2).

C.  *The Merits of Washington's Claims*

    1.  *Evidence of the Victim's Criminal Record*

Washington argues that the trial court "improperly refused to provide appellant with access to and to receive into evidence the victim[']s prior criminal record in support of appellant's testimony that he was aware of the victim's prior violent acts and to show that [the] victim's character made it likely that he was the initial aggressor." Pet. at 4; *see also* Br. for Def.-Appellant at 15-33, *People v. Washington*, Queens County Ind. No. 3994/01 (2d Dep't Jan. 2006) ("Appellant's Br.").

This argument, as explicated by Washington on appeal, raises three distinct issues. First, it alleges that the trial court erred by refusing to require the prosecution to disclose information regarding Pelle's criminal record to the defense. Second, it alleges that the trial court erred by refusing to admit such information as evidence both that Washington reasonably believed his use of force was justifiable and that Pelle was the initial aggressor. Third, it suggests that to the extent New York law bars the admission of such evidence for the latter purpose, Washington was deprived of the right to present a complete defense. I address each argument in turn.

6

a. *The Trial Court's Failure to Order Disclosure of Pelle's Criminal Record*

As Washington proceeded to trial, defense counsel asked for "access to the criminal record of the deceased." Tr. at 33. The prosecutor claimed that Washington was "not entitled to" this information, Tr. at 34, and, after some discussion, the court directed the prosecution to submit a sealed copy of the record to the court and stated that it would determine "during the course of the legal argument" whether Washington was "entitled to" the records. Tr. at 36. After Washington testified, defense counsel stated that

> based on the fact that my client has testified and put the defense of justification in, I think it's appropriate that the Court as the trier of fact also become aware of Mr. Pelle's record for two purposes. One, because Mr. Washington is using justification. But also based on his testimony with respect to the propensity of [*sic*] violence that Mr. Pelle displayed up until his death. And I think that becomes relevant as far as the actions that night and not only with respect to justification but who was the aggressor.

Tr. at 424-25. After a discussion of the admissibility of such evidence, the court stated: "Your application is denied, Mr. Brettschneider. Exception to the defendant. We'll leave that record sealed so it's still sealed as [*sic*] the way it is." Tr. at 452.

In essence, Washington's first argument is that the trial court erred by refusing to order the prosecution to disclose Pelle's criminal record to the defendant. This is only an error if the prosecution had some obligation to disclose this information. Accordingly, the relevant federal law is the Due Process Clause, as interpreted in *Brady v. Maryland*, 373 U.S.83, 87 (1963), where the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." [1] "There

---

[1] The decision of the Appellate Division only explicitly addressed Washington's contention that the trial judge erred by refusing to admit evidence of Pelle's criminal record. However, his argument that the trial court

7

are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, . . . that evidence must have been suppressed by the State, . . . and prejudice must have ensued." *Stickler v. Greene*, 527 U.S. 263, 281 (1999).

Washington suggests that Pelle's criminal record was "favorable" for two reasons. First, he argues that the record would provide evidence of past violent acts committed by Pelle and known to Washington. The New York Court of Appeals has held that evidence of such acts is admissible to demonstrate that a defendant asserting a justification defense reasonably believed he faced an imminent attack. *People v. Miller*, 39 N.Y.2d 543, 551 (1976). Second, Washington argues that Pelle's criminal history would provide evidence of Pelle's propensity for violence, and thereby support an inference that Pelle was the initial aggressor in their encounter.

Neither theory of exculpation makes out a *Brady* violation. Evidence of past violent acts is only exculpatory in New York if the defendant asserting a justification defense knew of those acts. *Miller*, 39 N.Y.2d at 551 (authorizing admission of "evidence of the victim's prior specific acts of violence *of which the defendant had knowledge*") (emphasis added). To show that evidence was "suppressed" in violation of *Brady*, however, Washington must show that he did not or should not have known of the essential facts permitting him to take advantage of the exculpatory evidence. *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982). If Washington knew, as he testified, that Pelle possessed a gun at a particular time, or was involved in a murder at a particular time, his defense counsel could have obtained the public records

---

erred by failing to require the prosecution to disclose Pelle's criminal record to the defense was raised and fairly presented to the state court in Washington's counseled appellant brief. *See* App. Br. at 21 ("In short, the court improperly denied appellant access to Pelle's criminal record on the ground that appellant could not use it in his defense."). It was therefore encompassed in that court's summary dismissal of Washington's "remaining claims" as "without merit," *People v. Washington*, 843 N.Y.S.2d 686, 686 (2d Dep't 2007), and is properly before me in the instant petition.

evidencing those acts (if any existed) through its own investigation. Indeed, appellate counsel turned up a great deal of information regarding Pelle's criminal history using "the CRIMS System." App. Br. at 14 n.7. Although appellate counsel also asserted a belief "that the criminal records which the prosecution provided to the trial court may be more complete than those available from the CRIMS system," she did not allege, and I see no reason to believe, that the defense could *only* have obtained more detailed records by requesting them from the prosecution. *Id.* at 14. As appellate counsel noted, "[r]ecords of the criminal convictions of an adult are hardly confidential." *Id.* at 21. Because "[d]ocuments that are part of public records are not deemed suppressed if defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation," *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995), the prosecution did not violate *Brady* by refusing to disclose criminal records pertaining to violent acts by Pelle that were known to Washington.

To the extent that Pelle's criminal record evinced past violent acts unknown to Washington, I cannot say that Washington had constructive knowledge of such acts. However, the "suppression" of this evidence did not violate due process for a different reason. The New York Court of Appeals has consistently declined "to discard the rule recognized in *People v. Rodawald* (177 NY 408) and in self-defense cases to admit proof of specific acts of violence committed by the deceased victim for the purpose of showing that he was the aggressor." *In re Robert S.*, 52 N.Y.2d 1046, 1048 (1981). Accordingly, even if defendant had obtained evidence of such acts, it would have been inadmissible at trial, and there is no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In sum, the district court's refusal

9

to order the prosecution to disclose Pelle's criminal record to Washington did not violate clearly established federal law.

        b.      *The District Court's Failure to Admit Evidence of Pelle's Criminal Record*

Washington also alleges that the district court erroneously excluded evidence of Pelle's criminal record. Although the Supreme Court has been reluctant "to impose constitutional constraints on ordinary evidentiary rulings by state trial courts," *Crane v. Kentucky*, 476 U.S. 683, 689 (1986), it has held that "in the absence of any valid state justification, exclusion [of some kinds of] exculpatory evidence deprives a defendant" of his constitutional right to "a meaningful opportunity to present a complete defense." *Id.* at 690.

In this case, however, the defendant had no evidence to offer. As discussed above, the district court properly refused to order the prosecution to disclose Pelle's criminal records to the defense. As a result, there is no indication that the defense possessed any competent evidence of Pelle's criminal record apart from Washington's testimony, which was admitted without objection. Because a court does not violate the Constitution by failing to receive evidence that was not offered, this argument fails. For the same reason, I conclude that the rule of *In re Robert S.*, which bars evidence of a violent propensity to prove that a victim was the initial aggressor, did not deprive Washington of his right to present a complete defense in this case. Although this rule may represent a "much criticized minority view," *Williams v. Lord*, 996 F.2d 1481, 1485 (2d Cir. 1985) (Cardamone, J., concurring), the rule itself does not prevent a party (and did not prevent Washington) from *offering* evidence at trial. Because Washington has failed to identify any exculpatory evidence that was properly offered and improperly refused, this portion of his petition is without merit.

2.  *Right to Counsel*

   a.  *Washington's "Conflict" with Hancock*

Washington's complaints about Hancock, his first lawyer, are described most clearly in a March 2, 2002 letter Washington wrote to the American Bar Association and attached to his motion to vacate his conviction. Affidavit in Support of Mot. to Vacate Judgment, Ex. B, *People v. Washington*, Queens County Ind. No. 3994/01. Although Hancock opined that the facts of Washington's case suggested negligent homicide rather than murder, he advised Washington to take a plea. He also stated "I didn't get paid enough to do the work that needed to be done," didn't "consult with [Washington] or investigate [his] claims or witnesses[]," failed to show up for a scheduled court date and offered no reason for doing so, and didn't "present[]" the "majority of [Washington's] "Rosario [m]aterial" to his client before the hearing. *Id.*

As a preliminary matter, Washington has failed to show that he was prejudiced by Hancock's allegedly deficient performance. Although he alleges that the trial court failed to investigate a conflict of interest that adversely affected counsel's performance, the only specific shortcoming he identifies is Hancock's failure to file a motion to suppress on the ground that Washington was arrested in violation of *Payton v. New York*, 445 U.S. 573, 576 (1980), in which the Supreme Court held that the Fourth and Fourteenth Amendments prohibit the police "from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Detective Michael Carrano, who arrested Washington, attempted to testify at trial that the police entered the apartment where Washington was apprehended with consent. Tr. at 85-90. Although the trial judge erroneously prevented him from doing so on hearsay grounds,

there is no indication in the record that the police entry was nonconsensual. Accordingly, Hancock's failure to request a *Payton* hearing was not ineffective and did not prejudice Washington.

Washington attempts to style his difficulties with Hancock as an "actual conflict of interest" that "adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). In some circumstances, the existence of such a conflict entitles a defendant to a new trial even absent a showing of prejudice. *Id.* at 349-50. The Appellate Division summarily denied this argument on the merits. Although its reasons for doing so are unclear, there are several reasons why the decision does not constitute an unreasonable application of clearly established federal law as announced by the Supreme Court.

First, the nature of the conflict suggested by Washington is unclear. In his *pro se* brief, he argued that "there was a fee discrepancy, and the conflict arose when counsel failed to represent the appellant during the proceedings 'zealously' because he knew the fee would not be coming forthwith." *Pro Se* Supp. Br. at 9, *People v. Washington*, No. 5801/04 (2d Dep't May 15, 2006) ("*Pro Se* Br."). In his reply brief here, however, he contends that "The Respondents clearly are mistaken in their view that the source of the conflict concerned a fee dispute. It was counsel's (Hancock) actions [that] were the source of the conflict. Counsel's failure to submit a significant motion and his less than zealous/adequate representation was a disregard for the petitioner's rights." Reply Mem. at 6. If I credit this second contention, then there is clearly no "conflict of interest" at all. If a lawyer doesn't heed his clients requests or advocates lamely for no reason, there is no conflict of interest -- there is simply frustration of the client's interest cognizable as ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668,

12

687 (1984), which requires a showing of both deficient performance and resulting prejudice. As the term suggests, it is only when a lawyer "actively represented conflicting interests" that a conflict of interest emerges. *Cuyler*, 446 U.S. at 350.

Even if the conflict asserted by Washington, contrary to his current position, was a conflict between his interest and his lawyer's financial self-interest, the legal significance of such a conflict is unclear. The definition of "actual, relevant conflict of interest" announced by Justice Marshall's partial concurrence in *Cuyler*, which refers to divergence of "the defendants' interests" only addresses conflicts posed by multiple representations such as those present in *Cuyler*. *Cuyler*, 446 U.S. at 356 n.3 (Marshall, J., concurring in part and dissenting in part). And the Supreme Court has never applied its "actual conflict of interest" jurisprudence in the context of a lawyer providing shoddy representation to further his own financial interests. Although the Second Circuit has stated that "an actual conflict of interest for trial counsel" under *Cuyler* can arise when a client's "interest in effective representation [are] pitted against trial counsel's monetary interest," *Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir. 1993), the Fifth Circuit has held that conflicts between a defendant's interest and his lawyer's self-interest are properly analyzed under the ineffective assistance framework of *Strickland v. Washington*. *Beets v. Scott*, 65 F.3d 1258, 1272 (5th Cir. 1995) (*en banc*). Accordingly, the state court could reasonably have decided that Washington's alleged "conflict of interest" was actually an ineffective assistance claim and denied it for lack of prejudice.

Washington also claims that the trial court breached its duty to inquire into this alleged conflict. Of course, if the discord between Hancock and Washington is properly analyzed under *Strickland*, as some courts have held, then no duty to inquire would arise.

13

Furthermore, even if a conflict involving the lawyer's financial self-interest is an "actual conflict" whose existence might give rise to a duty to inquire, it would not be unreasonable to conclude that the record in this case failed to trigger that duty.

After conferring with Washington at the beginning of the suppression hearing, Hancock indicated that his client wished to address the court. The following colloquy ensued:

> THE DEFENDANT: At this present time I cannot retain Mr. Hancock.
> THE COURT: He's willing to do the hearing without you having to pay him so there is no problem.
> THE DEFENDANT: Still, I don't feel . . .
> THE COURT: You don't feel what?
> THE DEFENDANT: I don't feel comfortable right now.
> THE COURT: I feel comfortable. I got a cop sitting out in the audience. We have everybody ready. We're doing this hearing. Then if you want to hire somebody else or you want me to appoint an 18-B I'll do that. But everybody is present here now and we'll do the hearing now. You have a very competent lawyer. You understand? Okay.

The trial judge obviously (and reasonably) interpreted Washington's first statement as a concern about the expense of retaining Hancock. Given the ambiguity of Washington's response, it would not be an unreasonable application of clearly established federal law to conclude that "the *possibility* of a conflict of interest" was not "sufficiently apparent at the time . . . to impose upon the court a duty to inquire further." *Wood v. Georgia*, 450 U.S. 261, 272 (1981). Accordingly, Washington is not entitled to relief on the grounds that the trial court should have inquired further into the alleged conflict between Washington and Hancock.

Washington also suggests that he was denied the right to counsel of his choice when the trial court forced him to proceed with Hancock as his attorney at the suppression hearing after Washington informed the court that he no longer wished to retain Hancock's

services. There is no indication, however, that Washington informed Hancock or the court of his wishes until immediately before the hearing was scheduled to begin. Because a trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar," and has the power to "make scheduling and other decisions that effectively exclude a defendant's first choice of counsel," *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006), it was not an unreasonable application of federal law to conclude that the trial court's actions did not violate Washington's right to counsel of his choice.

      b.    *Washington's "Conflict" with Brettschneider*

Washington also argues that Scott Brettschneider, who represented Washington at trial, labored under a conflict of interest because he represented Trevor Bailey, an uncle of Darryl Pelle, in an "unrelated" matter. Reply Mem. at 7. However, Washington does not suggest how Brettschneider's representation of Bailey in a matter that had no bearing on Washington's case adversely affected his representation of Washington. Indeed, according to Washington's appellate counsel, although Brettschneider admits that he represented Bailey, he did not believe that Bailey and Darryl Pelle were related, and was unaware of any possible relation during his representation of Washington. Pet. Reply. Mem. Ex. A.

Prior to trial, the prosecutor handed over only an "extract" of witness John Pelle's criminal history to defense counsel. Tr. at 56. Washington alleges that this violated *Brady v. Maryland*, and that Brettschneider was ineffective for failing to object to it. However, there is no indication that the information omitted from this extract would have been useful in impeaching Pelle. Furthermore, given that John Pelle was extensively cross-examined regarding his criminal record, Tr. 175-97, there is no "reasonable probability that, had the evidence been disclosed to

15

the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. Given the weakness of the *Brady* claim identified by Washington, I have no trouble concluding that trial counsel was not deficient for failing to raise it.

Washington also alleges that Brettschneider ineffectively failed to object to improper closing arguments. Although the prosecutor described Washington's testimony as "clearly tailored," Tr. at 491, and "too tailored," Tr. at 502, which suggest an impermissible personal opinion as to Washington's credibility, he did not misrepresent Washington's testimony or the other evidence. And taken as a whole, his argument properly urged the judge to reject Washington's testimony based not on the prosecutor's say-so, but on the testimony's rampant inconsistencies and implausibilities. Because this argument was proper, defense counsel did not err in failing to object to it.

Washington's reply brief also contends that his appellate counsel was ineffective. Because he has failed to identify any claim that should have been pressed on appeal but was not, this argument is without merit. *See, e.g., Rolling v. Fischer*, 433 F. Supp. 2d 336, 351 (S.D.N.Y. 2006) ("[T]here can be no claim of ineffective assistance of appellate counsel where the underlying claims of ineffective assistance of trial counsel are themselves meritless.").

CONCLUSION

For the reasons stated above, Washington's petition is denied. As Washington has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.

So ordered.

JOHN GLEESON, U.S.D.J.

Dated: Brooklyn, New York
June 8, 2009